OPINION
Defendants-appellants, Dr. Christine Corbin, Dr. Jean Reinhold, and West Shore Women's Health Associates (hereinafter "appellants"), appeal from a jury verdict rendered in favor of plaintiffs-appellees, Martin Russell, by his parents and next friends Helen M. Russell and Mark D. Russell, Helen M. Russell and Mark D. Russell (hereinafter "appellees"). Co-defendant CSA St. John Ministries dba St. John West Shore Hospital is no longer a party to this appeal.
In the early morning hours of January 27, 1995, Martin Russell was born prematurely at Metrohealth Medical Center. Martin was born during the twenty-ninth week of his mother's pregnancy and weighed approximately two pounds and thirteen ounces. Several hours before giving birth to Martin, Helen Russell was transferred to Metrohealth Medical Center from St. John West Shore Hospital. The reason for the transfer was that it had become apparent that, due to the presence of a bacterial infection in Mrs. Russell's amniotic fluid, labor could no longer be prevented and that the baby's needs would be best served by being born at a facility equipped to handle extremely premature infants.
At the time that he was born, Martin appeared to be as healthy as could be expected for a baby of his gestational age, but his health soon began to deteriorate. Approximately, forty-eight hours after birth, Martin experienced serious intraventricular hemorrhaging on both the right and left side of his brain.
As a result of the complications experienced during the pregnancy, the premature delivery, as well as the resulting postpartum trauma, Martin sustained severe and irreversible injuries to his brain which have resulted in mental retardation, near blindness, cerebral palsy and periodic seizures.
On January 26, 1995, the day before Martin's birth, Mrs. Russell reported to the Labor and Delivery Unit at St. John West Shore Hospital at the directive of her primary care ob/gyn. Dr. Christine Corbin. Mrs. Russell had been feeling ill with a fever and other flu-like symptoms for a period of approximately one week prior to this date. In addition to the flu-like symptoms, Mrs. Russell had also been experiencing uterine contractions which had been increasing in intensity. During the one week period between January 18, 1995 and January 26, 1995, Mrs. Russell had seen Dr. Corbin or one of her partners at West Shore Women's Health Associates, for these same symptoms on approximately four occasions and had kept in telephone contact with the office. Prior to January 26, 1995, Mrs. Russell's last visit to Dr. Corbin's office had been on January 23, 1995.
At approximately 1:00 p.m., after performing a physical exam on Mrs. Russell, Dr. Corbin performed an amniocentesis, a somewhat high risk procedure, in order that she could test for a condition known as chorioamnionitis. The quickest, although not necessarily the most accurate, test for determining whether the amniotic fluid is infected with bacteria is known as a gram stain. A gram stain test involves taking a sample of the amniotic fluid, obtained through amniocentesis, and checking for the presence of bacteria by applying a chemical agent to the sample and examining it under a microscope. The testimony was consistent throughout the trial that a gram stain test takes only a few minutes to conduct, if the appropriate laboratory facilities are available, and that the total turn around time can be as little as a half-hour to an hour.
In this case, when Dr. Corbin sent the specimen out for testing, she did not specifically request that it be performed immediately, or "stat."[1] Within two months prior to the day in question, St. John West Shore Hospital had changed its procedure regarding gram stain testing so that any gram stain test which was not marked "stat" was actually sent downtown to St. Vincent Charity Hospital for testing. Dr. Corbin testified at trial both that she was not aware of this change of policy and that she had not had occasion to order a gram stain test at St. John West Shore Hospital prior to the day in question.[2]
Approximately forty-five minutes to an hour after performing the amniocentesis on Mrs. Russell, Dr. Corbin left the hospital to attend a seminar in Cincinnati which was sponsored by a manufacturer of gynecological equipment. Prior to leaving the hospital, Dr. Corbin prescribed a tocolyctic agent (magnesium sulfate) for Mrs. Russell, the desired effect of which was to suppress the contractions she had been experiencing and to prevent her from going into labor. Mrs. Russell was also given Erythomycin[3] at this time, an antibiotic and penicillin substitute, to combat any potential infection. Dr. Corbin informed Mrs. Russell that she would be gone until the following evening, told her that her care would be handled in the interim by one of Dr. Corbin's partners, co-appellant Dr. Jean Reinhold, and stated that she would call in and check on Mrs. Russell later that evening.
Sometime around 5:30 p.m. Dr. Reinhold checked in on Mrs. Russell after being informed by hospital staff that her condition appeared to be worsening as it related to her temperature, physical pain and discomfort, and uterine contractions. Dr. Reinhold examined Mrs. Russell and decided that both mother and child were doing satisfactory, despite the fact that Mrs. Russell's white blood cell count was elevated, and that Martin's heart rate was significantly elevated.
At approximately 9:15 p.m., the hospital finally received the results of the gram stain test that had been ordered in the early afternoon. The test came back positive for an infection. At this point it became apparent that labor and delivery were an inevitability and arrangements were made to transfer Mrs. Russell to Metrohealth Medical Center. At Metrohealth Medical Center, two additional antibiotics, Clindamycin and Gentamicin,[4] were given to Mrs. Russell, as well as Picotin, a drug commonly used to induce labor. At 2:17 a.m. the next morning, Mrs. Russell gave birth to Martin. Although Martin initially appeared healthy, and registered Apgar scores which were as well as could be expected given his gestational age,[5] it became apparent within an hour of his birth that he had a severe sepsis reaction as a result of his mother's Strep B infection. As was stated earlier in the recitation of facts, approximately forty-eight hours after birth, Martin suffered severe hemorrhaging of the brain which in turn led to debilitating and permanent injuries including mental retardation and blindness, as well as other serious complications.
The appellees filed the within lawsuit in the. Cuyahoga County Court of Common Pleas on July 18, 1996. The basic theory of recovery asserted in the complaint was that, by their failure to assure that the gram stain results were processed in the most timely fashion possible, and by their failure to follow up with the lab, the appellants caused a delay in the course of treatment for chorioamniontosis — which includes inducing labor as soon as possible. The appellees alleged that the sepsis infection Martin was born with was allowed to become progressively more serious during the approximately ten hour delay in inducing labor caused by the dilatory processing of the gram stain test results.
On May 27, 1998, following a two and one-half week trial, a jury awarded Martin Russell a verdict of $5,770,000 against Dr. Corbin, Dr. Reinhold, and St. John West Shore Hospital. The jury also found in favor of Helen Russell and Mark Russell in the amount of $820,000 on their loss of consortium claim. The court's judgment entry and the verdict forms do not indicate that the jury apportioned liability amongst the several defendants. On May 29, 1998, the trial court issued three separate judgment entries. These three entries each entered judgment in favor of all three appellees and against Dr. Corbin, Dr. Reinhold and St. John West Shore Hospital, respectively, for the full amount of the verdict.[6]
Additionally, the court issued a subsequent journal entry, dated June 1, 1998, which read:
 JURY CONTINUES TO DELIBERATE. JURY RETURNS A VERDICT IN FAVOR OF PLAINTIFF MARTIN RUSSELL AND AGAINST ALL DEFENDANTS. JURY RETURNS A VERDICT IN FAVOR OF PLAINTIFFS HELEN M. RUSSELL AND MARK D. RUSSELL AND AGAINST ALL DEFENDANTS. FINAL.
On June 11. 1998, the appellees filed a Motion for Prejudgment Interest which was premised on the purported failure of the appellants to use good faith to attempt to settle the case, or to objectively evaluate their potential liability. The trial court conducted a two day hearing on the motion commencing on July 16, 1998. On August 25, 1998, the trial court denied the Motion for Prejudgment Interest without opinion.
Appellants timely filed a Notice of Appeal, containing three assignments of error from the verdict of the jury, as well as from some of the evidentiary rulings made by the trial court during the course of the trial. Additionally, the appellees filed a sole cross assignment of error in which they alleged that the trial court abused its discretion in not granting the Motion for Prejudgment Interest.
The appellants' first assignment of error states:
 1. THE TRIAL COURT INCORRECTLY DENIED DEFENDANTS' MOTION FOR DIRECTED VERDICT.
The appellants' Motion for Directed Verdict, made at the close of the plaintiff's case, argued that the appellees had failed to present any expert medical evidence demonstrating that Martin's injuries were caused by the defendant's negligence. Specifically, the appellants argued that the appellees' causation expert, Dr. J. Paul Goldsmith, testified that any child born at Martin's weight and gestational age has a 50% chance of suffering some intracranial hemorrhaging and of subsequently suffering resultant disabilities. Therefore, the appellees submit that there was insufficient evidence as to causation, and that their Motion for Directed Verdict should have been granted.
Civ.R. 50 (A), which sets forth the grounds upon which a motion for directed verdict may be granted, states:
(A) Motion for directed verdict.
 (1) When made. A motion for a directed verdict may be made on the opening statement of the opponent, at the close of the opponent's evidence or at the close of all the evidence.
 (2) When not granted. A party who moves for a directed verdict at the close of the evidence offered by an opponent may offer evidence in the event that the motion is not granted, without having reserved the right so to do and to the same extent as if the motion had not been made. A motion for a directed verdict which is not granted is not a waiver of trial by jury even though all parties to the action have moved for directed verdicts.
 (3) Grounds. A motion for a directed verdict shall state the specific grounds therefor.
 (4) When granted on the evidence. When a motion for a directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue.
A motion for directed verdict is to be granted when, construing the evidence most strongly in favor of the party opposing the motion, the trial court finds that reasonable minds could come to only one conclusion and that conclusion is adverse to such party. Civ.R. 50 (A) (4); Crawford v. Halkovics (1982), 1 Ohio St.3d 184; The Limited Stores, Inc. v. Pan American World Airways, Inc.
(1992), 65 Ohio St.3d 66.
A directed verdict is appropriate where the party opposing it has failed to adduce any evidence on the essential elements of this claim. Cooper v. Grace Baptist Church (1992), 81 Ohio App.3d 728,734. The issue to be determined involves a test of the legal sufficiency of the evidence to allow the case to proceed to the jury, and it constitutes a question of law, not one of fact.Hargrove v. Tanner (1990), 66 Ohio App.3d 693, 695; Vosgerichianv. Mancini Shah Associates, et al. (Feb. 29, 1996), Cuyahoga App. Nos. 68931 and 68943.
In this case the appellants fail to differentiate Dr. Goldsmith's testimony as to the probability of a premature baby of Martin's age and weight suffering any hemorrhage from the probability of such a child suffering severe hemorrhaging, such as that experienced by Martin. The evidence is undisputed that Martin suffered a Grade III hemorrhage on the right side of his brain and a Grade IV hemorrhage on the left side of the brain. Grade III hemorrhages are considered fairly severe and Grade IV hemorrhages are considered to be extremely severe. In contrast, many premature infants who suffer Grade I and Grade II hemorrhaging experience little, if any, long term effects.
Dr. Goldsmith testified that Martin was suffering from sepsis caused by the infection of his mother's amniotic fluid to the point of being in refractory septic shock at the time of his birth. Dr. Goldsmith, on direct examination, was asked whether he had "an opinion to a reasonable degree of medical probability what the consequences were to Martin's brain of the sepsis and the septic shock that you just described." Dr. Goldsmith answered "[i]t is my belief that the septic shock caused Martin's brain to have a severe grade three (sic) and grade four (sic) hemorrhageresulting in his handicaps today." (Emphasis added.)
Dr. Goldsmith further testified that only eight percent of all premature babies of Martin's weight suffer from a Grade III or Grade IV hemorrhage and that it was his belief that the reason that Martin suffered from a Grade III and a Grade IV hemorrhage was "because of the problems with the blood pressure secondary to the infection."
Dr. Goldsmith, on direct examination, was asked another question as to the principal causal factors of Martin's injuries as follows:
 Q: I'd like you to assume, Doctor, hypothetically, that instead of taking, whatever it was, ten hours to get the Gram stain results back, that those results were back within thirty minutes to an hour. * * * And that Helen Russell was then transferred to Metropolitan General Hospital by ambulance, and that when they got there, when she got there she was given the big gun antibiotics, that she did in fact get them, but got them at Metro, but if she was given them earlier and then that she was allowed to proceed to deliver ASAP, do you have an opinion, Doctor, to a reasonable degree of medical probability had that set of events occurred whether Martin Russell would have the degree of impairment that he exhibits today?
 A: My opinion is he would not have suffered a major hemorrhage. He would not be as handicapped as he is today. He may have suffered a minor hemorrhage because of his prematurity, but he would not have gone through the multiple organ system dysfunction, the hypotension, the capillary leak syndrome, the coagulation problems with platelets, and his hemorrhage would not, be in the major Grade II, Grade IV category. If mother had been appropriately given the antibiotics hours earlier.
It is the finding of this court that the above quoted testimony by Dr. Goldsmith on the issue of causation was sufficient to defeat the appellants' Motion for Directed Verdict. It cannot be said as a matter of law that, when construing the evidence presented by the appellees at trial, including the testimony of Dr. Goldsmith, most favorably in favor of the appellees, reasonable minds could only come to a conclusion which is adverse to the appellees and in favor of the appellants. In this case there was also competent expert testimony to the effect that both Dr. Corbin and Dr. Reinhold were negligent in not following up on the results of the gram stain test in a timely manner. The testimony of Dr. Goldsmith was sufficient, for the purposes of ruling on the Motion for Directed Verdict, to establish proximate cause between the purported negligence of these physicians and the injuries subsequently incurred by the appellees. The appellants' first assignment of error is not well taken and is overruled.
The appellants' second assignment of error states:
 2. THE TRIAL COURT INCORRECTLY PERMITTED EXPERT WITNESSES TO TESTIFY CONCERNING OPINIONS NOT BASED ON FACTS PERCEIVED BY THEM NOR ADMITTED INTO EVIDENCE.
This assignment of error is based almost entirely on the trial testimony of Mona Yudkoff, one of the appellees' experts who testified on the issue of damages. Ms. Yudkoff is a rehabilitation nurse consultant, who is certified by the Association of Rehabilitation Nurses and who operates her own rehabilitation consulting business, which is located in Philadelphia, Pennsylvania. In the course of her employment, Ms. Yudkoff provides information about the costs of rehabilitation and the cost of long term health care to her clients. Prior to Ms. Yudkoff's testimony, the trial court entertained an objection to much of the content of her report based on the contention that some of the report contained inadmissible hearsay evidence. Examples of this hearsay evidence are cost projections made by Ms. Yudkoff which were based on phone conversations she had with various service providers concerning future medical costs and expenses.
In ruling on the appellants' objection to the testimony of Ms. Yudkoff, the trial court stated as follows:
 I think the witness is going to be allowed to testify to facts perceived by her and within her realm of expertise which is pediatric rehabilitation. I didn't hear anything in your background that says she is an expert in costs, number 1. Number 2, I don't know of anything in evidence that she has looked at yet that can go that far as to the costs of this. If you get items in evidence, you can recall her, but so far I don't know of any that you're going to get into evidence, and from what I've heard thus far, it remains questionable as to whether or not you will be able to get those last two pages of six in. I don't know if you will or not, but right now, I can t let her go on. I have to follow the Ohio rules on this and she can testify to facts and data upon which her opinions or inferences are based, that she has perceived or admitted into evidence just like it says in the rule. That's it, it will be limited.
In reviewing the transcript of Ms. Yudkoff's testimony, it appears as if the trial court did indeed limit the scope of her testimony in the manner that it indicated it would in the ruling on the appellants' objection. Certain portions of Ms. Yudkoff's expert report were redacted and she was not permitted to testify as to findings contained in those sections of her report. The trial court sustained a number of objections made by defense counsel when Ms. Yudkoff was asked questions concerning cost estimates she had made by consulting third parties.
A trial court is vested with discretion in determining the admissibility of evidence in any particular case, so long as such discretion is exercised in conformance with the rules of civil procedure. Rigby v. Lake Cty. (1991), 58 Ohio St.3d 269, 271. Appellate review is limited to whether the trial court abused its discretion. Peters v. Ohio State Lottery Comm. (1992), 63 Ohio St.3d 296,299. The term "abuse of discretion" connotes more than an error of law or judgment, it implies the court's attitude is unreasonable, arbitrary or unconscionable." Blakemore v.Blakemore (1983), 5 Ohio St.3d 217, 219.
Evid.R. 702 provides that a witness may testify as an expert if each of the following three criteria:
 (A) The witness's testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons.
 (B) The witness is qualified as an expert by specialized knowledge, skill, experience, training or education regarding the subject matter of the testimony; and
 (C) The witness's testimony is based on reliable scientific, technical, or other specialized information.
Evid.R. 703 provides that opinion testimony by an expert must be based on facts or data "perceived by him or admitted into evidence at the hearing."
In this case, Ms. Yudkoff testified that she personally met with Martin, as well as the rest of the Russell family, in evaluating Martin's long term physical, psychological and financial needs. In addition, Ms. Yudkoff testified that she personally inspected the Russells' house prior to making her recommendations as to what structural changes would need to be made for the purpose of making the house more accessible for Martin and for making life as easy as possible for Martin's care providers. Ms. Yudkoff also stated that during the time she spent with Martin she observed him experiencing seizures on a number of occasions.
The trial court correctly permitted Ms. Yudkoff to testify as an expert in the field of pediatric rehabilitation.[7] Ms. Yudkoff's qualifications were impeccable and her testimony was based on facts and data that she personally perceived, as well as on cost estimates for certain items obtained from generally used industry publications. Ms. Yudkoff's competence, experience and knowledge in the field of long term care of extremely disabled persons such as Martin Russell is wholly uncontroverted. Therefore, there was no abuse of discretion by the trial court in this regard, as Ms. Yudkoff's expert testimony did not constitute impermissible hearsay. The appellants' second assignment of error is overruled.
The appellants' third assignment of error states as follows:
 3. THE JURY VERDICT WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE
The appellants' sole argument underlying this assignment of error is that the plaintiff's failed to provide expert testimony to the effect that the medical expenses incurred by Martin Russell, and which were admitted into evidence, were reasonable and necessary. The appellees, in response to this assignment of error, call the court's attention to a stipulation by the respective trial counsel that Dr. Goldsmith was of the opinion, and would have testified if given the opportunity, to his belief that "to a reasonable degree of medical certainty, * * * the medical and medical related services reflected on Plaintiffs' Exhibits 13 (A)-13 (E), 14 and 16 are reasonable and necessary." Given the fact that appellants are represented by new counsel on appeal, and that the record in this case is extremely voluminous, it is understandable that appellate counsel for the appellants might not have been made aware of the existence of this stipulation.
This assignment of error is without merit and is overruled.
In their cross appeal, the appellees present one assignment of error for this court's review:
 1. THE TRIAL COURT ABUSED ITS DISCRETION IN DENYING PREJUDGMENT INTEREST.
R.C. 1343.03 (C), which provides for prejudgment interest under certain circumstances, states in relevant part:
 Interest on judgment * * * shall be computed from the date the cause of action accrued to the date on which the money is paid, if, upon motion of any party to the action, the court determines at a hearing held subsequent to the verdict or decision in the action that the party required to pay the money failed to make a good faith effort to settle the case and that the party to whom the money is to be paid did not fail to make a good faith effort to settle the case.
If a party has a good faith objective and reasonable belief that he has no liability, then he is not compelled to make an offer to settle. Kalain v. Smith (1986), 25 Ohio St.3d 157. In evaluating whether a party has made a good faith effort to settle a case, a trial court must consider the following:
 1. Whether the party has fully cooperated in discovery proceedings;
 2. Whether the party has rationally evaluated his risk and potential liability;
 3. Whether the party has attempted to unnecessarily delay any of the proceedings; and
 4. Whether a good faith monetary offer was made, or responded to in good faith if made by the other party. Id.; Ziegler v. Wendel Poultry Serv., Inc.
(1993), 67 Ohio St.3d 10, rehearing denied, 67 Ohio St.3d 1425.
A determination of whether a party has made a good faith effort to settle, for purposes of awarding prejudgment interest, is within the sound discretion of the trial court. Felden v. AshlandChem. Co., Inc. (1993), 91 Ohio App.3d 48.
As was noted earlier in this opinion, the trial court held a two day hearing on the appellees' Motion for Prejudgment Interest on July 16, 1998. During the course of this hearing, testimony was received from a jury verdict consultant who had been hired by the appellees prior to trial, an insurance adjuster for the insurance company which provided coverage, a risk manager for St. John West Shore Hospital, co-counsel for St. John West Shore Hospital at trial, and lead counsel for the plaintiff. Additionally, the record contained the deposition testimony of the lead counsel for the two physician defendants and of the lead counsel for the hospital.
In the instant case, the appellants presented competent expert testimony at trial which, if believed, would have established that they were not guilty of negligence in failing to request that the gram stain test be processed more expeditiously, because the course of treatment for Mrs. Russell would not have been altered, regardless of the test results. The appellants also presented competent expert testimony on the issue of their choice of antibiotics and on the question of whether the fact that Martin Russell suffered from a sepsis infection at birth was the proximate cause of his severe hemorrhaging two days later.
This court, having reviewed the deposition and trial testimony of both Dr. Corbin and Dr. Reinhold, finds that both doctors genuinely believed that their standard of care in regards to both Martin Russell and Helen Russell was acceptable, and did not cause Martin's severe injuries. The fact that the jury eventually found that these two physicians did breach the applicable standard of care does not necessarily indicate that the physicians did not objectively believe that they had no liability. Since both of the doctors had malpractice insurance policies which required their consent to any settlement, they were within their rights to refuse to allow an offer of settlement to be made.
The plaintiff's own jury consultant testified that although the "average"[8] verdict of people he polled who were presented the facts of this case was approximately seven million dollars, a full 50% (23 of 46) of the respondents indicated that they would have found for the appellants and not awarded the appellees any damages. There were also a significant number of respondents who failed to find any negligence on the part of either Dr. Corbin or Dr. Reinhold. Without negligence, the issue of proximate cause is not even reached.
The record in this case does not indicate any misconduct or delay tactics on the part of the appellants. The jury was forced to decide between thorough and competent expert testimony presented by each of the parties concerning complicated medical procedures far beyond the understanding of the average laymen. The jury's verdict alone does not establish the bad faith required for an award of prejudgment interest under R.C. 1343.03
(C).
There is ample evidence that the appellants held a good faith belief that this was a defensible case. In addition, other experts in the field, such as seasoned malpractice attorneys, a veteran malpractice insurance adjuster, and medical specialists shared the appellants' belief that this was a defensible case. Therefore, the trial court's failure to grant the appellant's Motion for Prejudgment Interest was not an abuse of discretion.
This assignment of error is overruled.
Judgment affirmed.
It is ordered that plaintiffs-appellees/cross-appellants recover of defendants-appellants/cross-appellees their costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Common Pleas Court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
McMONAGLE, TIMOTHY E., P.J., and BLACKMON, J., CONCUR.
 __________________________________ MICHAEL J. CORRIGAN JUDGE
[1] Although Dr. Corbin originally testified at her deposition that she had requested that the test be performed stat, and implied that any delay was the fault of the hospital laboratory, she stated in her testimony at trial that she had not requested that the test be performed stat because she assumed from her experience as a resident at a hospital in Chicago that, due to the very nature of the procedure, any gram stain test would be performed immediately.
[2] Although Dr. Corbin practiced primarily at St. John West Shore during the time period in question (she also had privileges at several other hospitals), the reason that she had not had occasion to order a test prior to the one ordered for Mrs. Russell is because she had only opened her practice in August of 1994, a little more than five months earlier. In fact, Mrs. Russell was one of Dr. Corbin's first patients.
[3] It is widely accepted that the preferred antibiotic in this instance would have been penicillin. The reason that Erythromycin was prescribed was that Mrs. Russell was allergic to penicillin.
[4] These antibiotics were referred to by a number of the medical experts who gave depositions or testified at trial in this case as "big gun" antibiotics. There was some evidence introduced at trial that these drugs are more effective in treating situations where both mother and baby suffer from an infection because of their superior ability to "cross the placental barrier."
[5] The Apgar scoring system is a method in which physicians can evaluate the health and appearance of a newborn on a scale of one to ten. — Scores are given at one and five minutes.
[6] It is not readily apparent why the trial court did not simply issue one judgment entry stating that judgment was entered jointly and severally against all defendants, and in favor of plaintiff Martin Russell in the amount of $5,770,000, and in favor of plaintiffs Helen M. Russell and Mark D. Russell in the amount of $820,000. Yet, it is clear from the verdict forms, as well as the briefs of the parties in this appeal, that the intention of the jury, as well as the trial court, was to enter the respective judgments jointly and severally against the two doctors and the hospital.
[7] Ms. Yudkoff testified at trial that she had prepared between 500 and 1000 life plans similar to the one prepared on behalf of Martin Russell during the course of her career as a pediatric rehabilitation consultant.
[8] There was conflicting testimony by this consultant as to whether this average verdict accounted for the 50% of respondents who would have awarded the appellees $0.